IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

THE UNITED STATES OF AMERICA   §   CASE NOS. 4:18-cr-698
                               §              4:18-CR-699
                               §   HOUSTON, TEXAS
VERSUS                         §   WEDNESDAY
                               §   DECEMBER 14, 2018
SAAD SAID                      §   12:58 P.M. TO 2:13 P.M.

BOND/DETENTION AND ARRAIGNMENT HEARING

BEFORE THE HONORABLE CHRISTINA BRYAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                              SEE NEXT PAGE

COURTROOM DEPUTY/RECORDER:                SUZANNE GUEVARA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES:


FOR THE GOVERNMENT:            U.S. ATTORNEY'S OFFICE
                               Daniel Rodriguez, Esq., AUSA
                               Haywood Carter, Esq. AUSA
                               1000 Louisiana, Ste. 2300
                               Houston, Texas   77002
                               713-567-9638



FOR THE DEFENDANT:             Lawrence D. Tackett, Esq.
                               Attorney at Law
                               1400 Woodloch Forest Dr.,
                                 Suite 540
                               The Woodlands, Texas   77380
                               281-419-2626



ALSO PRESENT:                  Sheila Anderson,
                               Clerk

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| CHRISTOPHER SCRAVIS | | | | |
| By Mr. Rodriguez | 14 | . | 41 | . |
| By Mr. Tackett | . | 30 | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| Defendant's #1 | 29 | 30 | 30 |

1      HOUSTON, TEXAS; WEDNESDAY, DECEMBER 14, 2018, 12:58 P.M.

2              THE COURT:  Okay.  Mr. Said, you're set at

3      2:00 o'clock; is that right?

4              DEFENDANT SAID:  (No audible response.)

5              THE COURT:  Is counsel for Mr. Said here?

6              MR. TACKETT:  I'm here, Your Honor.

7              THE COURT:  Oh, yes.  Did we have you for the

8      2:00 o'clock Docket or -- oh, no, 11:00 o'clock Docket.

9              MR. TACKETT:  We are on 11:00 o'clock, Your Honor.

10             THE COURT:  Please come forward.

11             Let me ask my staff here if they're okay to continue

12     without food until -- are you okay?

13         (No audible response.)

14             THE COURT:  All right.

15             MR. TACKETT:  Good afternoon, Your Honor.

16             THE COURT:  Good afternoon.

17             Ms. Anderson, are you okay without eating?  Going

18     on?

19             MS. ANDERSON:  I'm fine, yes.  This is it.

20             THE COURT:  And let me ask the Marshals, are you

21     guys okay?

22             THE MARSHAL:  Always good, Judge.

23         (Court confers with staff.)

24             THE COURT:  Mr. Tackett, were you present for your

25     client's interview with Pretrial?

1          MR. TACKETT:  I was not, Your Honor.

2          THE COURT:  All right, counsel, I will let you

3    begin.  When we left off yesterday it was with the intention

4    that you would track down some of the financial information,

5    come back and try to address conditions of release.  So I'm

6    just going to -- you-all have the information, so I'm going to

7    let you just jump in.

8          MR. RODRIGUEZ:  Thank you, Your Honor.  Dan

9    Rodriguez and Haywood Carter for the United States, Your

10   Honor.

11         Our investigation as of yesterday till today has

12   basically once again confirmed that Mr. Said has basically

13   created a labyrinth of business entities, false statements and

14   bank accounts that make an understanding of his business

15   activities extremely difficult to unravel and establish

16   exactly what he owns and what he doesn't own, and when he owns

17   it and when he doesn't own it.

18         In order to attempt to unravel that labyrinth we

19   went -- we started with something very simple.  We went back

20   to Montgomery County Adult Supervision, which is the

21   institution that initially arrested him in June of this year

22   on similar charges that -- separate charges involving fraud by

23   this individual.  And inquired as to them as to what

24   information he had provided regarding his residence, his

25   employment and things of that nature.  And we found quite a

1      few variances.

2              The residence that he provided to the Montgomery

3      County Adult Supervision were two in number.  He claimed 6900

4      Lake Woodlands Drive, Apartment 1420 in The Woodlands, Texas

5      as being a property under his control that he either resided

6      at or his daughter or his parents resided at.  He also

7      provided a 25 -- correction, 24230 Kuykendahl Road in Tomball,

8      Texas, which comes back to basically a UPS box office address.

9      And there was also confusion and we haven't confirmed yet that

10     he also provided the address of 34230 Kuykendahl Road, which

11     is an address that doesn't exist at all.  The address that he

12     provided to Pretrial Services here is 25640 Haven Lake Drive

13     in Tomball, Texas.

14             We also discovered another business entity that he

15     did not disclose which he still utilizes.  It's Golden State

16     Holdings, Inc. which has a Secretary of State filing address

17     of 12301 Research Park Boulevard, Building 4, Suite 20,

18     Austin, Texas.  What's interesting about this, and once again

19     goes to the obfuscation that he perpetrates as part of his

20     fraud, is the director for this company is listed as Claudine

21     Fitzsimmons who we believe is the sister-in-law to his brother

22     Sahir (phonetic).  It has an asset of Middlesteadt Shopping

23     Center which is located at 14919 Stuebner-Airline in Houston,

24     Texas, which he signed as officer of the company, and a deed

25     of trust and promissory note in the sum of $680,000 on

1        October 21st, 2013.

2                THE COURT:  One second.  Claudine Fitzsimmons is a

3        director of Golden State Holdings.  She's his sister-in-law.

4        And then you lost me at the Middleton and the Stuebner.

5                MR. TACKETT:  Okay.  So what he then -- what

6        happened was this holdings company ended up purchasing a

7        property known as 14919 Stuebner-Airline, Houston, Texas,

8        which is also known as Middlesteadt Shopping Center.  And he

9        was the individual who signed as the officer of the company

10       and signed the deed of trust and promissory note for the

11       purchase of that property which sold for $680,000 on

12       October 21st, 2013.  And the note was to be paid by

13       October 21st, 2018.

14               However, on April 30th, 2015, he filed a Chapter 7

15       bankruptcy petition which was ultimately converted to a

16       Chapter 11 bankruptcy petition where he listed this property

17       as one of his assets as part of the bankruptcy proceeding.

18               Then we turn to SJS, the business entity that has

19       been associated with his common-law spouse.  At this point the

20       registered agent for that business is Mr. Tackett here, and

21       the address for that business is listed as Mr. Tackett's law

22       office.  Its original address was 24230 Kuykendahl, Suite 310

23       to 311 in Tomball, Texas, which Said has used as the address

24       for other companies he has created and used for fraudulent

25       purposes.

1          THE COURT:  The 24230 Kuykendahl address, is that

2     actually your law office address, Mr. Tackett?

3          MR. TACKETT:  It is not, Your Honor.

4          MR. RODRIGUEZ:  No.  What is his address which is

5     now the current address for this company, of his company -- I

6     misspoke -- is 1400 Woodloch Forest Drive, Suite 540, The

7     Woodlands, Texas.  That's the current address listed for this

8     company, for SJS.  The Kuykendahl address was the original

9     address given for the business, but then it was changed to

10    reflect Mr. Tackett's law office address as the physical

11    location of the business.

12         THE COURT:  Physical location of the business or the

13    physical location of the registered agent for service of

14    process?

15         MR. TACKETT:  No, no, the physical location of the

16    business itself, as well as him being listed as the registered

17    agent for purposes of service of process.

18         THE COURT:  Okay.

19         MR. RODRIGUEZ:  I've also been informed by

20    Mr. Tackett that the passport has been located, but it hasn't

21    been produced yet.  So we haven't had an opportunity to review

22    the passport to see exactly what it says or doesn't say.

23         THE COURT:  Where is the passport, Mr. Tackett?

24         MR. TACKETT:  It's en route, Your Honor.  I expect

25    to have it here just any time.

1          THE COURT:  All right.

2          Without the passport do you -- Mr. Rodriguez,

3    without the passport do you have any ability to check his out-

4    of-country travel in the past year?

5          MR. RODRIGUEZ:  No, Your Honor, we don't.  And

6    Mr. Carter also has additional information regarding the

7    assets, failure to disclose.

8          MR. CARTER:  Your Honor, just going back to the

9    Montgomery disclosures from June of this year which was listed

10   in Montgomery County.  The only assets listed in Montgomery

11   County were a 2015 Ford F-150 and listed income as $15,000 a

12   month, which is significantly different than what was reported

13   here during his most recent arrest, Pretrial Services.

14         THE COURT:  I would like to ask Pretrial Services

15   the total income from businesses:  95,833, that is information

16   that you obtained from the defendant, correct?

17         PRETRIAL SERVICES OFFICER:  That's correct, Your

18   Honor.  He itemized the income for each business.

19         THE COURT:  Okay.

20         PRETRIAL SERVICES OFFICER:  Thank you, Your Honor.

21         THE COURT:  Anything else, Mr. Rodriguez?

22         MR. RODRIGUEZ:  One other thing that I just received

23   today from Mr. Tackett is a notice of default, an intent to

24   accelerate regarding the $1.2 million property that was part

25   of the Pretrial Services Report.  What I find of particular

1    interest is the date of this notice is December 10th, 2018,

2    which is the date that Mr. Saad Said was arrested in this

3    case.

4                    THE COURT:  May I see that?

5                    MR. RODRIGUEZ:  Yes, Your Honor.

6                    THE COURT:  Who is Ian Gerard?

7                    MR. TACKETT:  He is the owner of the property, Your

8    Honor, that is the homestead of my client.

9                    THE COURT:  What's his relationship to your client

10   and how does your client have a homestead on a property he

11   doesn't own?

12                   MR. TACKETT:  My client purchased the property from

13   Mr. Gerard, and Scott Winn (phonetic) is the trustee for Mr.

14   Gerard.

15                   THE COURT:  How long has Mr. Said lived and had this

16   property as his homestead?  When he did homestead it and when

17   did he move in there?  This is the 4502 –

18       (Talking off the Record)

19                   THE COURT:  Which property is this?

20                   MR. TACKETT:  Homestead on Lake Haven, Your Honor.

21                   THE COURT:  Okay.  So –

22                   MR. TACKETT:  And he's lived there since March of

23   2018, Your Honor.

24       (Talking off the Record)

25                   THE COURT:  Since March of 2018?

1        MR. TACKETT:  What I'm hearing is he moved in in

2    March -- in June of 2017, and then he purchased the property

3    in March of 2018, Your Honor.

4        MR. RODRIGUEZ:  And six months ago he told

5    Montgomery County two different addresses as his residence.

6        THE COURT:  Okay.

7        Do you want to respond to any of this information,

8    Mr. Tackett?

9        MR. TACKETT:  Your Honor, obviously there are some

10   very serious charges here, and quite a few charges.  I've been

11   provided with a lot of discovery this morning and I've looked

12   over most of it; not all of it, of course, and I can't verify

13   it.

14       With regards to setting a bond in this case, Your

15   Honor, I don't think that Mr. Said is a danger to the

16   community by any stretch of the imagination.  I don't think he

17   -- he's never had any violent history.  I think there are

18   conditions the Court could set here that would assure his

19   appearance in court.

20       As Mr. Rodriguez mentioned, he has cases in

21   Montgomery County that are similar to the ones before the

22   Court here.  He's made all of his court appearances in that

23   case, Your Honor.

24       I believe that if we surrender the passport, which

25   we are going to be doing very shortly, if he were ordered on

1    the monitor program, Your Honor, where we could monitor his

2    whereabouts and a reasonable bond could be set, I believe that

3    that would assure his appearance in court.  I certainly think

4    that a large bond, a high bond would be something that would

5    be impossible for him to do.

6         The only property that he actually owns, Your Honor,

7    is the one that the Court has the notice on there.  And that's

8    in default for foreclosure.

9         THE COURT:  Repeat the last thing you just said?

10        MR. TACKETT:  The only property that he actually

11   owns at this time is the property, his homestead on Lake Haven

12   Drive, Your Honor, which you have the notice of the

13   foreclosure there.

14        THE COURT:  And are you telling me that Sterling --

15   well, it's owned by Sterling Investors, according to his

16   Pretrial Services Report.

17        MR. TACKETT:  That's his corporation, Your Honor.

18        THE COURT:  And what about SJS Development and

19   Construction?

20        MR. TACKETT:  That's his wife's corporation.

21        Incidentally, Your Honor, with respect to -- I do

22   serve as the registered agent on SJS.  His wife requested that

23   I do that.  I was asked to do that.  I do that for almost all

24   my clients that are corporate clients.

25        THE COURT:  But that's a completely different issue

13

1    from listing the physical address of the business as -- I'm

2    not saying you had anything to do with him listing your

3    address as the physical address of his business.  But that --

4    it's not just that you are listed as the registered agent for

5    service of process.  The business is supposed to be actually

6    located physically at your law office.

7              MR. TACKETT:  I understand.  And that is not the

8    case.

9              THE COURT:  All right.

10             What's your position now on --

11             MR. RODRIGUEZ:  And that's the problem we're faced

12   with, Judge.  Although, you know, he's charged with crimes of

13   fraud, we feel that he's also perpetrating a fraud upon this

14   Court by making these numerous false statements and false

15   declarations to Pretrial Services and representations to this

16   Court here today.  So I don't see how this Court can fashion a

17   bond condition where the very genesis of the bond has to be

18   based on the belief that his word is his bond.  And this

19   individual has shown no commitment to complying with any word

20   associated with this Court or with his business activities.

21   For that reason I think detention --

22             THE COURT:  So you're now moving for detention.?

23        MR. RODRIGUEZ:  Yes, Your Honor.

24             THE COURT:  Okay.  So the Government is not willing

25   to agree to conditions of release or to a bond.  They're

1   moving for detention.  You're entitled to a hearing on that

2   issue.  You can do that right now.  Are you prepared to go

3   forward?

4           MR. RODRIGUEZ:  We've got the agent who'll just

5   repeat what I just said.

6           THE COURT:  All right.  Let's go forward.

7           MR. TACKETT:  Very well.  Thank you, Your Honor.

8           THE COURT:  All right.  Thank you.

9           And, Mr. Rodriguez, the statutory basis that you're

10  moving under, is it a two?

11          MR. RODRIGUEZ:  Yes, Your Honor.  Risk of flight,

12  Your Honor, no danger.

13      (Pause in the proceedings)

14      (Talking off the Record)

15          THE COURT:  All right.  I'm waiting for my case

16  manager to come back, but I can go ahead and swear the witness

17  and we can get started if you're all ready.

18          MR. RODRIGUEZ:  One second, Your Honor.

19          THE COURT:  Okay.

20          Are you ready, Susie?

21          UNIDENTIFIED SPEAKER:  Yes.

22          THE COURT:  All right.

23      (Witness sworn)

24          THE COURT:  Proceed, Mr. Rodriguez.

25          MR. RODRIGUEZ:  Thank you, Your Honor.

1            DIRECT EXAMINATION OF CHRISTOPHER SCRAVIS

2   BY MR. RODRIGUEZ:

3   Q    Agent Scravis, would you please state your full name and

4   for the benefit of the court reporter spell your last name?

5   A    Christopher Scravis, S-C-R-A-V-I-S.

6   Q    And how are you currently employed?

7   A    Special Agent with the FBI.

8   Q    And how long have you been so employed?

9   A    Approximately two years.

10  Q    And where are you currently stationed?

11  A    In Houston, Texas.

12  Q    And what do your duties involve?

13  A    I conduct investigations of financial crimes.

14  Q    As a result of your duties in that capacity did you get

15  involved in an investigation of an individual you ultimately

16  identified as Saad Said?

17  A    I did, yes.

18  Q    And what caused you to become involved in that

19  investigation?

20  A    Around the end of 2016, beginning of 2017, a complainant

21  approached the FBI stating that he was involved in a wholesale

22  product scheme identified by some entity using an alias name.

23  Q    And what was the alias name being used?

24  A    Patrick Carrier.

25  Q    And what did this individual tell you regarding this

1     individual's representations to him regarding the sale of
2     wholesale goods?
3     A    He said that he represented he was able to sell wholesale
4     products at below market value.  Once the money was provided
5     to this individual no product was ever provided nor a refund
6     was ever provided back.
7     Q    As a result of his contact with this individual were wire
8     transfers made based on representations made by this
9     individual identifying himself as Patrick Carrier?
10    A    Yes.
11    Q    And do you recall the monetary sums that were involved in
12    those transfers?
13    A    The total?
14    Q    Yes.
15    A    In the indictment it was approximately $560,000, which
16    was a partial representation to the overall case.
17    Q    And how were you able to ultimately identify that this
18    individual Patrick Carrier was an individual ultimately
19    identified as Saad Said?
20    A    Victim 1 of the indictment was defrauded by somebody
21    under a different alias, Isaac Swami who utilized an email
22    address that was ultimately used to direct the initial
23    complainant to a email address owned or utilized by somebody
24    going by the name of Patrick Carrier.  That initial victim who
25    was defrauded by this Isaac Swami identified -- provided a

1    photograph which included a picture of Saad Said.

2    Q    And you were able to verify that the individual that was

3    using the name Isaac Swami was actually Saad Said?

4    A    Correct.

5    Q    And do you see that individual present in the courtroom

6    here today?

7    A    I do, yes.

8    Q    And where is he seated and can you describe a piece of

9    clothing that he's wearing?

10   A    He's seated at the defense table wearing a orange

11   jumpsuit.

12   Q    Now as a result of the use of the name Isaac Swami did

13   you also ultimately identify other victims where this

14   individual Saad Said had used other aliases?

15   A    I did, yes.

16   Q    And how many other victims as relates to the indictment

17   did you ultimately identify?

18   A    Four victims.

19   Q    Now let's go -- you just identified the first victim and

20   you claim that that victim was defrauded by an individual

21   using the name Isaac Swami, correct?

22   A    Correct.

23   Q    We now proceed to Victim No. 2.  Victim No. 2, how did

24   that individual make contact with the individual that was

25   ultimately identified as Saad Said?

1    A    That victim was put in contact with an individual by

2    going by the name as Patrick Carrier which, as mentioned, was

3    identified as being Saad Said through another wholesale

4    product broker who presented Victim 2 with the deal that Saad

5    Said was offering him.

6    Q    And once again, as a result of those contacts did Patrick

7    Carrier/Saad Said ultimately cause Victim No. 2 to make wire

8    transfers of monetary sums to Mr. Said in anticipation of a

9    sale of wholesale goods that were being sold purportedly by

10   Mr. Said?

11   A    He did, yes.

12   Q    And did Victim 2 ever receive any of those goods?

13   A    He did not, no.

14   Q    Now you said there were a total of four victims.  Let's

15   proceed to Victim No. 3.  How did Victim No. 3 get identified

16   and how did he or she ultimately get engaged with Mr. Saad

17   Said?

18   A    Victim 3 was the original complainant of the

19   investigation.  He was put -- similar situation as the other

20   victims.  He was initially put in contact with Saad Said as

21   Patrick Carrier through a multitude of wholesale product

22   brokers that were trying to strike a deal with Saad Said.

23   Q    And as a result of those contacts Victim No. 3 ultimately

24   also wire transferred U.S. dollar sums to Mr. Said?

25   A    Yes.

1    Q    And did he ever receive the goods that he believed he had

2    purchased from Mr. Said?

3    A    No.

4    Q    Using the alias Patrick Carrier; am I correct?

5    A    Correct, no.

6    Q    Did any of these victims ever know either Isaac Swami or

7    Patrick Carrier under his true name, Saad Said?

8    A    No.

9    Q    Now you said there was a fourth victim.  How did that

10   fourth victim get involved?

11   A    Again, similar situation.  Victim 4 was introduced to Mr.

12   Said going by the name Alexander Cruse (phonetic) by another

13   wholesale product broker offering below market value pricing

14   on wholesale products.

15   Q    And how were you able to ultimately determine that

16   Alexander Cruse was Saad Said?

17   A    Mr. Said owns the email domain he was utilizing to

18   contact the victim.  And Victim 4 had their pictures taken

19   with Mr. Said while they flew from their home country in

20   Northern Ireland to Houston, Texas to meet with Mr. Said to

21   view the product he was representing he could sell to them.

22   While they were out to have a meal together they had a picture

23   taken.

24   Q    And have you had an opportunity to view that photograph

25   and compare it to the individual present in the courtroom here

1    today?

2    A    I did, yes.

3    Q    And do you have an opinion as to whether that's the same

4    individual that's present in the courtroom here today?

5    A    It is the same person.

6    Q    And did Victim 4 ever learn that Alexander Cruse's true

7    name was Saad Said?

8    A    No.

9    Q    And did Victim No. 4 also wire transfer monetary sums in

10   belief that they were purchasing wholesale goods from Mr.

11   Alexander Cruse/Saad Said?

12   A    Yes, they did.

13   Q    And did they ever receive those goods?

14   A    No, they did not.

15   Q    And what would Mr. Saad Said, using these various

16   aliases, give as explanations to these victims as to why they

17   were not receiving their goods once the monies had been

18   received?

19   A    It was identified in emails, email addresses utilized by

20   Mr. Said.  There was just constant communication back and

21   forth providing most of the time, in my opinion, incoherent

22   excuses as to why the products were not going to be delivered,

23   and it was usually putting blame on the victims.

24   Q    And did he provide them with actual invoices representing

25   that he already owned these wholesale goods?

1    A     He did, yes.

2    Q     And did you ultimately determine that those invoices were

3    fraudulent in nature?

4    A     Yes.

5    Q     And were those some of those invoices from Sam's

6    Wholesale Club?

7    A     Yes, they were.

8    Q     And did you actually contact Sam's Wholesale Club and

9    present them with those invoices?

10   A     We did, yes.

11   Q     And what did they tell you was the legitimacy of those

12   invoices?

13   A     They were not legitimate invoices.

14   Q     Now, as it relates to all that I'd like to turn your

15   attention to the information that Mr. Saad Said has provided

16   this Court and Pretrial Services regarding his ties to the

17   community, his assets and his business entities.  Now as a

18   result of yesterday's hearing you were provided that

19   information so that you could seek to verify and corroborate

20   the validity of those statements; am I correct?

21   A     Correct.

22   Q     And as result of that did you get ahold of the Montgomery

23   -- you or one of your colleagues get ahold of the Montgomery

24   Adult Probation Department to determine what information he

25   had provided to them upon his arrest on similar charges out of

1      Montgomery County?

2      A    We did, yes.

3      Q    And did you find any discrepancies between the

4      information he had provided to Montgomery County and the

5      information that you were provided -- that he had provided to

6      this Court through Pretrial Services?

7      A    We did, yes.

8      Q    And what discrepancies did you identify between the

9      information provided to Montgomery County and this Court?

10     A    According to Montgomery County Mr. Said, upon his arrest

11     earlier this year, he provided two addresses as his --

12     representing his residences.  None of which were the address

13     identified to Pretrial Services by Mr. Said.

14     Q    And what were those two addresses; do you have them

15     before you?

16     A    Yes.  The first address was 34230 Kuykendahl Road,

17     Tomball, Texas 77375.

18     Q    And what was the other address?

19     A    The other address was 6900 Lake Woodlands Drive,

20     Apartment 1420, The Woodlands, Texas.

21     Q    And what did he tell them was his marital status?

22     A    Single.

23     Q    And what did he tell them was his employment?

24     A    Owner of SCS Financial Group.

25     Q    Did he provide any other forms of employment beyond that?

1   A    He did not, no.

2   Q    What did he provide as his listed income per month?

3   A    Fifteen thousand dollars per month.

4   Q    How many vehicles did he identify to them as being in

5   possession of?

6   A    One vehicle.

7   Q    And what was the make and model of that vehicle?

8   A    It was a 2015 Ford F-150.

9   Q    Did he list any other assets?

10  A    No other assets.

11  Q    Did he also provide information as to his citizenship

12  status with Iraq and/or Germany?  I think you'll find that on

13  the second page, first paragraph.  Starts on December 6.

14  A    Can you please state the question again?

15  Q    Sure.  Based on the information you received from Mr.

16  Wiesels (phonetic) with the Montgomery County Adult Probation

17  Office; am I correct?

18  A    Yes.  This information was reiterated by a special agent

19  with HSI to Mr. Wiesels.

20  Q    Am I misreading this?  Does the email state that he

21  claims to be a national, dual citizenship of Iraq and Germany?

22  A    That's what the email says.  However, this is an email

23  that appears to have gone from HSI to Montgomery County.

24  Q    Okay.  So it's HSI's position that he provided that

25  information to HSI?

1    A    Correct.

2    Q    Okay.  And that he claims to be a lawful resident of the

3    United States; am I correct?

4    A    Correct.

5    Q    Now I'd like to direct your attention to business

6    entities that he disclosed to Pretrial Services that he

7    claimed to have ownership of.  He identified a total of three.

8    Global Cosmetics, Inc.; Sterling Investors Holdings; and SCS

9    Financial Group, LLC.  In your investigation did you identify

10   any other business entities or holdings that he possesses?

11   A    Yes.

12   Q    And what additional business entities that you've

13   identified that he possesses or controls/owns?

14   A    Golden State Holdings, Inc.

15   Q    And how were you able to determine that he's associated

16   with Golden State Holdings, Inc.?

17   A    Through a -- a promissory note and warranty deed that was

18   signed by Saad Said on behalf of Golden State Holdings, Inc.

19   for the purchase of Middlesteadt Shopping Center in Texas.

20   Q    And who was listed as the owner of that business entity?

21   A    The owner was listed as Claudine Fitzsimmons.

22   Q    And based on your investigation, what relationship does

23   Claudine Fitzsimmons have with Mr. Saad Said?

24   A    We believe Claudine Fitzsimmons is Mr. Said's sister-in-

25   law.

1   Q    And why do you believe that Mr. Saad Said has a business

2   ownership relationship to this business entity?

3   A    He listed himself as an officer of the company when he

4   signed the promissory note and the warranty deed.  And in a

5   bankruptcy filing he listed himself as the president of Golden

6   State Holdings, Inc.

7   Q    And did he also list it as an asset associated with his

8   bankruptcy filing under --

9   A    He did, yes.

10  Q    -- Chapter 11?

11  A    Yes.

12  Q    Do you recall what was the date of that bankruptcy

13  filing?

14  A    Approximately December 2014.

15  Q    Okay.  And did you actually get a copy of the deed of

16  trust for that property that reflects him as the person

17  signing the deed of trust?

18  A    Yes.

19  Q    And do you know whether that bankruptcy proceeding is

20  still being disposed of?

21  A    It's my understanding it is.

22              THE COURT:  Where is that bankruptcy filed?  Where

23  is the bankruptcy?  Is it in the Southern District of Texas or

24  somewhere else?

25              THE WITNESS:  Yes, Your Honor.

1          MR. RODRIGUEZ:  Yes.

2          THE COURT:  You know the case number?

3          MR. RODRIGUEZ:  Let me see if I can get it, Judge.

4          THE WITNESS:  Case No. 14-36650.

5          THE COURT:  Thank you.

6     BY MR. RODRIGUEZ:

7     Q    And what was the address listed for Golden State

8     Holdings, Inc.; do you recall?

9     A    The address listed for Golden State Holdings, Inc., as

10    far as the Texas Secretary of State filing was 12301 Research

11    Park Boulevard, Building 4, Suite 20, in Austin, Texas 78759.

12    Q    Now in the deed of trust that he executed, what was the

13    address associated with Golden State Holdings, Inc. on the

14    deed of trust?

15    A    The address on the deed of trust for Golden State

16    Holdings, Inc. was 21 Waterway, Suite 300, The Woodlands,

17    Texas 77380.

18    Q    And the deed of trust, what was the original principal

19    amount?

20    A    $680,000.

21    Q    Now as it relates to SJS Construction entity that your

22    investigation, I believe, established, at least on its face,

23    is purportedly owned by his common-law spouse; am I correct?

24    A    Yes.

25    Q    What did you find in your investigation that associated

1    Mr. Saad Said's involvement with that business entity?

2    A    For SJS?

3    Q    Yes.

4    A    SJS owns four properties in the Houston area.  And during

5    the investigation we identified that Mr. Said had some, at

6    least, involvement in the acquisition of those properties.

7    Q    And based on your investigation where is the current

8    physical address listing for SJS Development and Construction

9    Services?

10   A    The most recent address we were able to identify for SJS

11   Development and Construction Group is 1400 Woodloch Forest

12   Drive, Suite 540, The Woodlands, Texas 77380.

13   Q    And were you able to identify where that address -- what

14   that address is associated with?

15   A    It's associated with Lawrence D. Tackett.

16   Q    And did you determine that was a law firm location for

17   Mr. Lawrence Tackett?

18   A    Correct.

19   Q    Did you determine any of these business entities being

20   used to pay credit card payments for Mr. Said's credit cards?

21   A    Yes.

22   Q    And which ones did you identify were paying off Mr.

23   Said's credit card payments?

24   A    CMS Funding Group, registered to his common-law spouse

25   Dani Hicort (phonetic).

1    Q    So although the business is owned on paper by his common-

2    law spouse, it is being utilized to pay off credit card

3    payments for Mr. Saad Said?

4    A    It was, yes.  In addition to that there was a check in

5    one bank account associated or owned by CMS Funding Group for

6    approximately, I believe it was over $10,000 to Texas Gas and

7    Energy Development, which is another company owned by Mr.

8    Said.

9              THE COURT:  Okay.  CMS Funding Group is the name of

10   the entity you're talking about right now that made a $10,000

11   payment to Texas Gas Energy?

12             THE WITNESS:  Yes, Your Honor, Texas -- Texo -- I'm

13   sorry, Texo, T-E-X-O, Gas and Energy Development.

14             THE COURT:  And CMS Funding is not identified in any

15   of the Pretrial Services reports as a company that Mr. Said

16   has reported he owns an interest in; is that correct?

17             THE WITNESS:  Correct.

18             THE COURT:  All right.  Okay.  Thank you.

19   BY MR. RODRIGUEZ:

20   Q    What vehicles have you identified as being associated

21   with Mr. Said?

22   A    There's a Bentley, Continental 2009.  He was arrested in

23   a Land Rover.  And, I'm honestly not sure, I don't have that

24   information in front of me.

25   Q    Are any of those cars in his name?

CHRISTOPHER SCRAVIS - DIRECT BY MR. RODRIGUEZ          29

1    A     No, they're not.

2    Q     Are they in one of his business entities' names?

3    A     From what I can recall they're in his spouse's name, Dani

4    Hicort.

5              MR. RODRIGUEZ:  I have no further questions, Your

6    Honor.

7              THE COURT:  All right.  Thank you, Mr. Rodriguez.

8              Mr. Tackett?

9              MR. TACKETT:  Your Honor, I have the passport.  May

10   I tender that to the Court?

11             THE COURT:  Yes.

12             MR. TACKETT:  In addition, Your Honor, I have the

13   real estate documents on the wrap-around note on the

14   homestead.

15             THE COURT:  Okay.  You want to make those an exhibit

16   or...?

17             MR. TACKETT:  Yes, Your Honor, I'd like to offer

18   these.

19             THE COURT:  All right.  Are those copies or are

20   those originals?

21             MR. TACKETT:  These are copies, Your Honor.

22             THE COURT:  Okay.  You can redo them.  I have

23   reviewed the passport.  I would like to give it to the

24   Government and I would like for -- it is expired.  Expired in

25   2016, but I would like to know what the status of his

1    international travel, if any, was up through time of the

2    expiration of the passport.

3              MR. RODRIGUEZ:  I will try, Judge.  As soon as we

4    get the agent off the stand I'll have him go do that.

5              THE COURT:  Okay.

6              MR. TACKETT:  With regard to the exhibits, Your

7    Honor, may I have them marked?

8              THE COURT:  Yes.

9              THE CLERK:  Do you want individual exhibits or one

10   big exhibit?

11             MR. TACKETT:  Just one big exhibit should be fine.

12        (Talking off the Record)

13             MR. TACKETT:  I'd like to submit this to Mr.

14   Rodriguez.

15             THE COURT:  All right.

16        (Talking off the Record - Pause)

17             MR. RODRIGUEZ:  The only thing I'd like to bring to

18   the Court's attention is once again, Sterling Investors

19   Holding, Inc.'s physical address is being listed once again as

20   Mr. Tackett's law office, I believe; am I correct?

21             MR. TACKETT:  Yes, I'm the registered agent for

22   them.

23             MR. RODRIGUEZ:  But that's listing as the address of

24   the business, as well.

25             MR. TACKETT:  I understand.

1          I'd like to offer this if I may, Your Honor?

2          THE COURT:  Yes.  All right, give me just a moment

3     to review Exhibit #1.  And, Mr. Tackett, this is for the --

4     this is for the house, the homestead?

5          MR. TACKETT:  It is, Your Honor.

6          THE COURT:  All right.

7        (Pause - Court reviewing Exhibit #1)

8          THE COURT:  And, Mr. Tackett, what is the purpose

9     for which you are marking Exhibit #1 for this hearing?

10         MR. TACKETT:  Your Honor, to demonstrate that

11    through his corporation that's the only property that he

12    actually owns.  And there's little or no equity in that

13    property that could be used to post a bond.

14         THE COURT: All right.  All right.  Okay, you may

15    proceed.

16         MR. TACKETT:  Thank you, Your Honor.

17           CROSS-EXAMINATION OF CHRISTOPHER SCRAVIS

18    BY MR. TACKETT:

19    Q    Pardon me, is it Agent Scravis?

20    A    Scravis.

21    Q    Scravis.  Agent Scravis, when did you become assigned to

22    this case?  When did you begin your investigation?

23    A    It was around the early 2017, January 2017.

24    Q    All right.  And you've identified four victims in four

25    transactions involving the defendant.  Those are listed in the

1   indictment; is that correct?

2   A    Yeah.  More transactions than four though.  There's four

3   victims and 11 transactions.

4   Q    Okay.  Now what entities or the names of what individuals

5   -- in Victim No. 1 what name was that business conducted

6   under?

7   A    Associated to the victim?

8   Q    To the defendant.

9   A    The defendant.  My recollect -- I don't have the

10  indictment in front of me, but if I recall it was Aldo

11  Investments or operating as Aldo Investments.

12          MR. RODRIGUEZ:  I'm willing to provide -- with

13  counsel's permission, a copy of the indictment to the --

14          MR. TACKETT:  Oh, I actually have it here.

15          MR. RODRIGUEZ:  Okay.

16          THE COURT:  Well, let's -- If you're going to ask

17  him about information in the indictment, let's just for sake

18  of time, let's provide the indictment.

19          MR. TACKETT:  Okay.

20          THE COURT:  If you want to ask him about other

21  information, then -- that's not in the indictment, then he

22  doesn't need to have it.

23  BY MR. TACKETT:

24  Q    Who is Aldo Investments?

25  A    Aldo Investments is a company registered to Saad Said.

1   Q    All right.  And do you know whether or not there was a

2   sales contract that was ever signed or any kind of memorandum

3   between the parties with respect to the purchase?

4   A    There was a commercial invoice that was provided by Mr.

5   Said to Victim 1.

6   Q    Was there ever any other writing, any other legal writing

7   with respect to the purchase and the transaction as to how

8   much was going to be transferred, how it was going to be

9   transferred?

10  A    I don't recall at this time.

11  Q    All right.  So you don't know whether there was an

12  agreement with respect to how the sale was going to take

13  place; is that correct?

14  A    There was an agreement at the very -- so my confusion is

15  just that each situation with each victim was different.  So

16  for each, if I'm going to look and do a deep dive, basically,

17  into each individual victim, my notes in my case file would be

18  able to assist.  But in regards to the invoices or any kind of

19  signed agreement, from what I can recall it was a invoice and

20  either a verbal or a email communication agreement as to what

21  was actually going to transpire.

22  Q    All right.  Do you know what the agreement actually was

23  as it relates to how the goods were going to be transferred or

24  shipped?

25  A    Each situation was different.  It was either up to the

1    buyer themselves to pick it up or it was going to be shipped

2    by Mr. Said's company.

3    Q    All right.  With regards to Victims 2, 3 and 4, is that

4    the same situation?

5    A    Yes.

6    Q    Do you know whether there were any sales contracts

7    signed?

8    A    I don't know that, sir.

9    Q    Do you know what the terms of delivery were in each of

10   these transactions?

11   A    It was specified in some of the invoices.  And

12   specifically in regards to Victim 1, the email Mr. Said

13   provided to Victim 1 listed when the "on or before" date of

14   delivery would take place.

15   Q    Do you know whether any goods were ever delivered under

16   any other transactions to any -- not to these victims, but to

17   any -- in any other transaction if goods were actually

18   delivered?

19   A    Not that were identified.

20   Q    So you don't know whether Mr. Said ever made other deals

21   and actually delivered goods; is that correct?

22   A    Correct.

23   Q    You have the actual invoices and you have those in your

24   file, the actual invoices?

25   A    Yes.

1    Q    Okay.  Were there any other documents related to these

2    sales transactions other than the invoices?  Emails?

3    A    There was a multitude of emails, yes.  And that was how

4    most of the business deal was conducted was through email.  I

5    would say almost entirely for Victim 1 it was through back and

6    forth email.

7    Q    All right.  In each of these cases did Mr. Said raise a

8    question with regards to how the delivery was going to take

9    place on the goods?

10   A    How do you mean, sir?

11   Q    Did he send an email to each of these victims telling

12   them why they could not receive delivery of the goods?

13   A    Yes.

14   Q    Okay.  Was it more than one email?  Was it a series of

15   emails where he was explaining why the delivery couldn't take

16   place?

17   A    In some instances.

18   Q    Did he offer to make refunds?

19   A    He did, yes.

20   Q    In each of these cases?

21   A    If not all, most.

22   Q    Okay.  Do you know whether there were emails coming from

23   the victims asking for refunds?

24   A    Yes.

25   Q    And the response email from Mr. Said was that he would

1    make the refund?

2    A    In some instances, yes.

3    Q    Do you know whether there were ever any refunds made?

4    A    To our -- according to our investigation there were no

5    refunds made.

6    Q    Now, Agent Scravis, you have listed a couple of

7    residences here that were listed through Montgomery County.

8    34230 Kuykendahl, 77375, that's Tomball.  And 6900 Lake

9    Woodlands Drive, Apartment 1420 in The Woodlands.  Do you know

10   whether the defendant ever lived at either one of those

11   places?

12   A    Through a quick search the 34230 Kuykendahl Road does not

13   appear to be a legitimate address.  I'm not certain whether

14   this is a typo.  There are similar addresses listed on

15   companies Mr. Said either owns or is associated with, and that

16   address is 24230, so it's just off by one number and that's a

17   UPS store.  So, obviously, he's not living there.  And the

18   6900 Lake Woodlands Drive, apartment number, during an

19   interview following arrest of Mr. Said he made a statement

20   that that apartment was maintained for when his parents would

21   visit from Germany and so that his daughter could use that

22   address and attend The Woodlands High School.

23   Q    Do you know whether he ever lived at that address?

24   A    I don't know that.

25   Q    Okay.  So if he put that on a form for Montgomery County

1    for Pretrial you wouldn't know whether that was an accurate

2    address or not?

3    A    Correct.

4    Q    Also, on his Pretrial at Montgomery County he listed his

5    marital status as being single.  Do you believe that that's

6    accurate?

7    A    As far as I'm concerned, it is.  He has a common-law

8    wife.  I have no evidence to show that he has a marriage

9    certificate, but --.

10   Q    He lives with a young lady.

11   A    Correct.

12   Q    Her name is Dani Hicort.

13   A    Right.

14   Q    But they're not legally married; is that correct?

15   A    Correct, as far as I know.

16   Q    So if he were to list his marital status as being single,

17   you wouldn't have any problem with that, would you?

18   A    No.

19   Q    Okay.  Further, he listed $15,000 per month as income

20   from his various corporations.  Do you have any reason to

21   believe that that figure is inaccurate?

22   A    Yes.

23   Q    All right.  And based on what?

24        MR. RODRIGUEZ:  I'm going to object to that question

25   because it misstates the evidence.  He says it's income from

1    various corporations and that's not what he provided to

2    Montgomery County Probation Department.  He said he had only

3    one form of employment and it was that one company he named

4    that he provided and said that was the derivation of his

5    income.  So his statement that it comes from these different

6    corporations is inconsistent with what the evidence

7    establishes.

8              MR. TACKETT:  May I rephrase the question, Your

9    Honor?

10             THE COURT:  You may.

11   BY MR. TACKETT:

12   Q    Agent Scravis, you had given testimony that Montgomery

13   County reflected that he had $15,000 worth of income.  Was

14   your testimony that it came from only one source or from

15   multiple sources?

16   A    One source.

17   Q    And what source was that?

18   A    From being the owner of SCS Financial Group.  This is

19   coming from Montgomery County.

20   Q    SCS Financial Group?

21   A    Yes.

22   Q    All right.  And who is the person responsible for that?

23   Who is the -- is the defendant engaged in that corporation, as

24   well?

25   A    Yes, he's the managing member.

1    Q    Okay.  I didn't see that listed anywhere.  Also he listed

2    in his paperwork with Montgomery County a 2015 Ford F-150

3    truck.  Do you know whether or not he owns that truck?

4    A    I do not know that.

5    Q    Okay.  Would you have any reason to believe that he

6    doesn't own it?

7    A    Just for the fact that the other vehicles associated with

8    his residence are not owned by him.

9    Q    Those were owned, I believe you testified, by his common-

10   law wife.

11   A    I don't know if -- Right.  I didn't state that they were

12   all owned by her, but I do know that a few, at least, are

13   owned by her.

14   Q    Now, Global Cosmetics, Inc., do you know whether or not

15   that corporation is still in good standing?

16   A    I do not know that.

17   Q    Okay.  That could be determined through the Secretary of

18   State though, couldn't it?

19   A    Correct.

20   Q    And Sterling Holdings, LLC, do you know whether that

21   corporation is in good standing?

22   A    I don't have that information with me, so I don't know.

23   Q    SJS Construction, do you know whether that corporation is

24   in good standing?

25   A    According to the Secretary of State, it is not.

1   Q    That's correct.  And Golden State Holdings, Inc, do you

2   know whether that corporation is in good standing?

3   A    It is not.

4   Q    CMS Funding Group, do you know whether that corporation

5   is in good standing?

6   A    I don't have that information in front of me.

7   Q    Would you be surprised to know that that is not in good

8   standing?

9   A    I would not be surprised.

10  Q    Now vehicles that were at the home, located at the home,

11  a 2009 Bentley vehicle, and you stated that that was owned by

12  --

13          MR. RODRIGUEZ:  For purposes of clarification, what

14  home are you referring to?

15          MR. TACKETT:  Oh, I was referring to the homestead,

16  Your Honor, the Lake Haven Drive.

17          THE COURT:  Okay, let's use addresses since there's

18  so many different properties that we are referring to.

19          MR. TACKETT:  Yes.  Thank you, Your Honor.

20          THE COURT:  And which was the corporation that you

21  said was no longer in good standing?

22          MR. TACKETT:  Actually all of these are no longer in

23  good standing, Your Honor.

24          THE COURT:  Global Cosmetics, Inc.

25          MR. TACKETT:  Global Cosmetics, Inc.

1              THE COURT:  Sterling Investors Holdings.

2              MR. TACKETT:  Sterling Holdings; SJS Construction;

3     Golden State Holdings, Inc.; and CMS Funding Group.

4              Now I'm not positive about Sterling Holdings, LLC,

5     Your Honor.  That may still be in good standing.

6              THE COURT:  But SCS Financial Group is in good

7     standing?

8              MR. TACKETT:  I believe that is no longer in good

9     standing, Your Honor.

10             THE COURT:  Was it in good standing in June of 2018?

11             MR. TACKETT:  It was not, Your Honor.

12             THE COURT:  Okay.

13    BY MR. TACKETT:

14    Q    Agent Scravis, with regards to the vehicles do you know

15    whether or not they had loans against them?

16    A    Yes, to my understanding, they did.

17    Q    All right.  Do you have any reason to believe that

18    there's any equity in those vehicles?

19    A    No.

20    Q    Do you have any reason to believe with respect to the

21    homestead on Lake Haven Drive that that has equity in it?

22    A    I don't know the financial standing on that property.

23    Q    Do you know that it was purchased for 1.2 million?

24    A    Yes.

25    Q    And currently there's a demand for delinquency of 350,000

1    and there's still a note for 1.2 million against that

2    property.  Does that comport with what you know about the

3    property?

4    A    That's new information to me.

5    Q    Do you know of any other assets that the defendant has

6    other than what we've gone over in Court here today?

7    A    Not that we could identify.

8    Q    Do you know of any bank accounts where he has large sums

9    of money in bank accounts?

10   A    Not that we could identify.

11   Q    Any stock holdings?

12   A    Not that I know of.

13   Q    Do you know of any property overseas that he might have?

14   A    No.

15          MR. TACKETT:  Pass the witness, Your Honor.

16          THE COURT:  All right.  Any redirect, Mr. Rodriguez?

17          MR. RODRIGUEZ:  Just very few.

18          REDIRECT EXAMINATION OF CHRISTOPHER SCRAVIS

19   BY MR. RODRIGUEZ:

20   Q    Regarding these properties that he lists as his home, who

21   is the actual owner of the property on -- as far as it's

22   paperwork?  Isn't one of his business entities is actually the

23   seller of a property to Mr. Said?

24   A    Yes.

25   Q    So basically he is paying a mortgage back to a company

1    that he controls and owns; am I correct?

2    A    Yes.

3    Q    And then any encumbrances incurred on that property,

4    which is either the homestead or whatever, is something that

5    the corporation has incurred as the mortgagor through some

6    other entity; am I correct?

7    A    Yes.

8              MR. RODRIGUEZ:  I have no further questions, Your

9    Honor.

10             THE COURT:  All right.  Anything further?

11             MR. TACKETT:  Nothing further, Your Honor.

12             THE COURT:  All right.  Any --

13             You're excused.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  Any other witnesses?

16             MR. RODRIGUEZ:  No, Your Honor.

17             THE COURT:  Mr. Tackett, do you have any witnesses?

18             MR. TACKETT:  I do not, Your Honor.

19             THE COURT:  Okay.  I'm ready for argument.

20             MR. RODRIGUEZ:  Once again, the very foundation of a

21   bond is based on the belief that an individual will be true to

22   his word in order to establish that there's a way to

23   incorporate a condition or combination of conditions that will

24   assure his presence at trial.

25             In this case we have, I believe, established by a

1    preponderance of the evidence that this individual has

2    committed a fraud upon the Court.  The most glaring one is one

3    that the Court just brought to the -- to Mr. Tackett's

4    attention.  He informed the Probation Department in Montgomery

5    County that his employment was the ownership of SCS Financial

6    Group.  But by his own admission he stated that as of June of

7    2018, prior to that, that company was not in good standing and

8    was not operational.  So when he made that statement to

9    Montgomery County, he lied to them.

10          Then we've got, as I said, a labyrinth of business

11   entities, false statements and bank accounts that he creates

12   in order to obfuscate his criminal activity.  And that's

13   exactly what he's trying to do to this Court here today is

14   provide a labyrinth of answers and entities and residences and

15   businesses and things of this nature such that we cannot

16   unravel where the truth truly lies.  Such that we can

17   ultimately determine what can and cannot be believed as it

18   relates to Mr. Saad Said.  And it's for that reason at this

19   point I don't believe there's any condition or combination of

20   conditions that will assure his presence at trial.

21          THE COURT:  Okay.  Thank you, Mr. Rodriguez.

22          Mr. Tackett?

23          MR. TACKETT:  Your Honor, Mr. Said has a wife,

24   common-law wife and three children.  They rely upon him for

25   support.

1          I certainly don't think that he is going to be a

2     danger to the community.  I think he's never had anything like

3     that in the past.

4          THE COURT:  The Government is not moving on the

5     danger to the community basis for detention.

6          MR. TACKETT:  I understand, Your Honor.

7          I think that there are things that the Court could

8     order here that would guarantee his compliance and his

9     appearance.  He has made appearances in the similar case in

10    Montgomery County, Your Honor.  He's had numerous settings

11    over the last six months.  He's made each and every setting on

12    time.

13         We have submitted the passport to the Court, Your

14    Honor.  He's surrendered that.  I think he could be monitored

15    and could be -- we could use that to determine his

16    whereabouts, if need be.

17         And he needs to be able to work, Your Honor.  As

18    well as with the myriad of charges that are here, he needs to

19    be able to work with his legal counsel in order to put a

20    defense together.  That's going to be extremely difficult for

21    him if he's in custody, Your Honor.

22         THE COURT:  Thank you, Mr. Tackett.

23         All right.  These are my findings.  I find that the

24    Government has met its burden to show by a preponderance of

25    the evidence that the defendant poses a serious risk of

1    flight.  And I'm basing my determination that they have met

2    that burden on the following facts.

3            The Defendant Mr. Said is a citizen of Germany.  His

4    parents live in Germany.  His wife, we've been told both he's

5    single and that he's married, but his wife is a citizen of

6    Colombia.  He has a daughter who's a citizen of Germany.  His

7    parents live in Germany and are citizens of Germany.

8            He's in the United States as a lawful permanent

9    resident.  The charges in this case could affect his ability

10   to remain in the United States.

11           He has not been candid with the Court regarding any

12   of the -- as far as I can tell, I cannot conclude that any of

13   the information in the Pretrial Services Report is reliable

14   because there's so much that is wrong or misstated, or again,

15   as the Government has said, obfuscated.  I don't have a basis

16   on which I can reliably impose conditions that I think will

17   reasonably assure Mr. Said's presence for his appearances and

18   would reasonably assure that he would not flee the country

19   based on his citizenship, the citizenship of his wife, the

20   citizenship of his parents and of one of his children.

21           He's got a net worth, according to what he told

22   Pretrial Services, of $3.216 million.  When we were here

23   yesterday the Government was willing to agree to a cash bond

24   of $500,000 along with conditions.  And Mr. Said did not want

25   to go forward on that basis.  He didn't want to post a cash

1    bond.

2              And there are multiple entities and assets that he

3    appears to own, or his wife or common-law wife owns that I

4    believe could be used to satisfy that cash bond.  But at this

5    point I'm going to detain him.

6              If you want to come forward later to reopen this and

7    propose some sort of cash bond, you can reopen the -- you can

8    move to reopen the hearing.  But at this point in time I don't

9    find any reason to believe that -- well, I find that the

10   Government has shown there's a -- by a preponderance of the

11   evidence that he's a serious risk of flight.

12             And I will enter a written order later today, but

13   those are -- that's a summary of the facts that I am basing my

14   opinion on.

15             Anything else?

16             MR. RODRIGUEZ:  Nothing from the Government, Your

17   Honor.

18             THE COURT:  All right.

19             MR. TACKETT:  Nothing from the defense, Your Honor.

20             THE COURT:  All right.  You're excused.

21             MR. TACKETT:  Thank you very much, Your Honor.

22             THE COURT:  Thank you.

23             Has Mr. Said been arraigned?

24             MR. RODRIGUEZ:  No, he has not.

25             MR. TACKETT:  He has not, Your Honor.

1          THE COURT:  We need to -- are you ready to do that?

2          MR. TACKETT:  I am.

3          THE COURT:  All right.  Let's do that.

4          Mr. Said, have you had the opportunity to review the

5    charges in the Indictment with your counsel?

6          DEFENDANT SAID:  Yes, Your Honor.

7          THE COURT:  And you had plenty of time to review the

8    Indictment itself?

9          DEFENDANT SAID:  Yes.

10          THE COURT:  I need you to answer audibly.

11          DEFENDANT SAID:  Yeah.

12          THE COURT:  Counsel, does your client waive a formal

13    reading of the Indictment?

14          MR. TACKETT:  We do, Your Honor.

15          THE COURT:  All right.  And just for the Record,

16    what are the penalty ranges in the event for Counts 1 through

17    11 as charged in the Indictment, wire fraud, violation of

18    18 United States Code Section 1347?

19          MR. RODRIGUEZ:  Zero to 20 years, up to $250,000

20    fine as to each of the 11 counts, and up to three years'

21    supervised release as to each of the 11 counts.

22          THE COURT:  All right.  Mr. Said, are you ready to

23    enter your formal plea to the charges in Counts 1 through 11

24    of the Indictment?

25          DEFENDANT SAID:  Not guilty.

1          THE COURT:  All right.  We will enter a not guilty

2     plea on your behalf, sir.

3          Your case has been assigned to Judge Sim Lake.  Your

4     trial setting is February 4th, 2019 at 1:00 p.m.

5          Your motions have to be filed no later than

6     December 20th, responses to motions by December 28th of 2018.

7          Your voir dire and jury charge are required to be

8     filed by January 25th of 2019.

9          Any questions?

10          DEFENDANT SAID:  Can I -- I mean, with authorization

11     from my attorney?

12          THE COURT:  Can you speak --

13          DEFENDANT SAID:  Can I say something without

14     authorization from my attorney.

15          THE COURT:  Sure.

16          MR. TACKETT:  I would not agree to allow him to do

17     that, Your Honor.

18          THE COURT:  I thought he was going to talk to you.

19          MR. TACKETT:  No, he's talking to the Court and I'm

20     not prepared to allow that.

21          THE COURT:  No, no.  Remember when I first saw you,

22     I said you have the right to remain silent.  Anything that you

23     say to anyone, including the Court, other than your attorney

24     can be used against you.

25          So anything you say at this point can be used

1    against you, including information that you give about your

2    financial condition or any of these assets that have been

3    discussed today.  So I'm not going to let you make a

4    statement.  You can talk to your attorney.  Tell him what you

5    want to say and if he wants to inform the Court about it, he

6    may do so.  All right?

7              All right.  Here's copies.

8              Anything else?

9              MR. CARTER:  Your Honor, would you like to arraign

10   him in 18-cr-699, it's the trafficking charge, as well?

11             THE COURT:  Thank you, Mr. Carter.  I just need to

12   find the file.

13             So for the Record, Mr. Tackett, the case he was just

14   arraign on was 4:18-CR-698.  Those were the 11 counts of wire

15   fraud.

16             He's also charged in Case No. 4:18-CR-699 with

17   Count 1, trafficking in counterfeit goods, a violation of

18   18 United States Code Section 2320(a)(4) and Section 2.

19             Count 2 is trafficking in counterfeit goods, in

20   violation of 18 United States Code Section 2320(a)(4) and

21   Section 2.

22             Count 3 is introducing misbranded drugs into

23   commerce in violation of 21 United States Code, Section

24   331(a), 333(a)(2), and 18 United States Code Section 2.

25             And Count 4 is also introducing misbranded drugs

1    into commerce, the same statutory violations apply.

2           The penalty range for Count 1 is a fine of not more

3    than $5 million or imprisonment of not more than 20 years, or

4    both, and a three-year supervised-release term.  The same

5    penalty applies to Count 2.

6           And the penalty with respect to Count 3 and Count 4

7    is a fine of not more than $10,000, or not more than three

8    years in prison, or both.  And not more than one year of

9    supervised release.

10          And then a $100 special assessment would apply for

11   each count.

12          Have you had the opportunity to review the

13   Indictment in Case No. 699, Mr. Said?

14          DEFENDANT SAID:  Yes.

15          THE COURT:  And have you had time to discuss those

16   charges with your counsel?

17          DEFENDANT SAID:  Yes.

18          THE COURT:  Are you ready to enter a formal plea

19   with respect to that Indictment?

20          DEFENDANT SAID:  Not guilty.

21          THE COURT:  Not guilty, all right.  And you waive

22   formal reading of the Indictment, Mr. Tackett?

23          MR. TACKETT:  We do, Your Honor.

24          THE COURT:  All right.  That case, the 699 case, has

25   been assigned to Judge Hanen.  Your trial date is set for

1    January 28th at 9:00 a.m.

2            Your motions are due by December 24th of 2018,

3    responses by January 7th of 2018 [sic].  Your pretrial

4    conference is on January 22nd, 2019.  Again, that's a typo on

5    that -- to read "January 7, 2019" and "January 22, 2019."

6            And again, jury trial on the 28th of January.

7            And we need an estimated number of trial days for

8    Judge Hanen on this 699.

9            MR. CARTER:  Two to three days, Your Honor.

10           THE COURT:  Two to three?

11           MR. CARTER:  Yes, Your Honor.

12           THE COURT:  All right.  Judge Hanen wants a

13   signature from all counsel and Defendant on the trial schedule

14   for the 699 case.

15           I don't think Judge Lake requires -- does Judge Lake

16   require signatures?

17           THE CLERK:  I don't --

18           MR. TACKETT:  Yeah, I don't believe there's a place

19   for a signature.

20           THE COURT:  Okay.  All right.  Anything else,

21   counsel?

22           MR. CARTER:  Nothing further, Your Honor.

23           MR. TACKETT:  Nothing further, Your Honor.

24           THE COURT:  All right.  Thank you.  You're

25   excused --

1          MR. TACKETT:  Thank you, Your Honor.

2          THE COURT:  -- after you sign the Scheduling Order.

3       (Proceeding concluded at 2:13 p.m.)

4                          * * * * *

5          *I certify that the foregoing is a correct transcript*

6    *to the best of my ability produced from the electronic sound*

7    *recording of the proceedings in the above-entitled matter.*

8       */S./  MARY D. HENRY*

9    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

10   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

11   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

12   *JTT TRANSCRIPT #60637*

13   *DATE FILED:  AUGUST 28, 2019*